Magistrate Judge Benton

05-MJ-00274-CMP

FILED LODGED ENTERED RECEIVED
JUN 06 2005
CLERK AT SEATTLE
WESTERN DISTRICT OF WASHINGTON
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | MAGISTRATE'S DOCKET NO. CASE NO. |
| Plaintiff, ) | 05-274M |
| v. ) | COMPLAINT for VIOLATION |
| JACK NICHOLS, ) a/k/a "Master Jack," ) | 31 U.S.C. § 5332 |
| Defendant. ) | |

BEFORE, Monica J. Benton, United States Magistrate Judge, Seattle, Washington. The undersigned complainant, being duly sworn, alleges:

### COUNT 1

### (Conspiracy to Engage in Bulk Cash Smuggling)

Beginning at a time unknown, but within the past five years, and continuing until on or about April 2, 2004, within the Western District of Washington, and elsewhere, JACK NICHOLS and others known and unknown, knowingly and intentionally did conspire to conceal more than $10,000 in currency on the person of an individual, and in a conveyance, article of luggage, merchandise, and other container, and transport such currency from a place within the United States to a place outside of the United States, with the intent to evade the currency reporting requirement under Title 31, United States Code, Section 5316(a)(1)(A).

All in violation of Title 31, United States Code, Sections 5332(a) and 5332(b)(1).

COMPLAINT/NICHOLS -1

1   The affiant further alleges the following facts establishing probable cause that the
2   above offense was committed by Nichols:

### TRAINING AND EXPERIENCE

I am a Special Agent with the Immigration and Customs Enforcement (ICE), United States Department of Homeland Security, currently assigned in Seattle, Washington. I have been employed by ICE since June 2003. Prior to my employment with ICE, I was a Police Officer with the Tacoma Police Department (TPD) for approximately ten years. From January 2001 until September 2002 I was assigned to the Special Investigation Division (SID), primarily responsible for narcotics investigations. From September 2002 until June 2003 I was assigned to the Drug Enforcement Administration (DEA) Task Force in Tacoma as a Task Force Officer (TFO). I have completed a 21-week ICE Basic Agent Training Course, which included the nine week Criminal Investigators Training Program and the twelve week Immigration and Customs Enforcement Special Agent Training Course. This instruction included training in the investigation of drug trafficking, methods of distribution of controlled substances, and financial money laundering investigations. I have also completed the Washington State Basic Academy, Basic Narcotics Investigators Course, Undercover Operators Course, Indoor Marijuana Investigators Course, Narcotics Investigations for Patrol Officers, Street Crimes and Surveillance Technics Course, Californian Narcotics Officers Investigators Course, and a Rave/Club Drug Course. Since my graduation from training, I have been assigned to investigate violations of federal controlled substance laws, that is, violations of Title 21, United States Code; as well as money laundering and bulk cash smuggling violations.

### PROBABLE CAUSE STATEMENT

The information contained in this Affidavit is based on my investigation, my training and experience, and on information related to me by other law enforcement officers through oral and written reports.

COMPLAINT/NICHOLS -2

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970

A. **Background**

The ICE Office in Blaine, Washington, in conjunction with the Royal Canadian Mounted Police (RCMP) in Vancouver, British Columbia, Canada, initiated an undercover operation to identify sources of supply of British Columbian marijuana ("BC bud") and their distributors within the United States. Agents from the RCMP and ICE acted as money launderers for the sources of supply in Canada. ICE Agents, acting in an undercover capacity, picked up monies from U.S. distributors of BC marijuana and turned it over to undercover RCMP officers who would then deliver the monies to the Canadian recipients and thus identify the sources of supply. During the UC operation, several U.S. distributors were identified.

In December 2004, a federal grand jury in the Western District of Washington returned a Third Superseding Indictment charging eighteen (18) defendants with Conspiracy to Engage in Bulk Cash Smuggling, in violation of Title 31, United States Code, Section 5332 (United States v. Douglas Alexander, et al., CR04-469P). To date, twelve of the defendants in the Alexander case have entered pleas of guilty. The criminal activities described herein, committed by defendant Jack Nichols, were part of the larger conspiracy alleged in the Alexander case.

ICE Special Agent David Van Kirk was the lead case agent in the Alexander case. I assisted in various aspects of the investigation, including investigating the armed robbery offense described below. I have discussed all of the facts set forth herein with Special Agent Van Kirk, and believe all of the information contained herein to be true and correct.

B. **Initial Currency Smuggling Attempt**

As part of this long term investigation, on March 25, 2004, a RCMP undercover operative was contacted by unindicted coconspirator #1.[1] The RCMP undercover

---

[1] Coconspirator #1 is one of the investigation's primary targets in British Columbia. The Canadian investigation has amassed evidence (including numerous undercover recordings) indicating that coconspirator #1 directs the importation of large quantities of marijuana into the United States, and the smuggling of bulk cash from the United States into Canada.

COMPLAINT/NICHOLS -3

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970

operative received a text message from coconspirator #1 requesting that the undercover operative arrange for the transportation of $500,000 from the United States to British Columbia. The text message indicated that the contact person for the money smuggling venture was "Master Jack," with phone number (604) 916-7315. Pursuant to the investigation, the RCMP passed along this information to ICE Supervisory Special Agent (SSA) Leonard V'Dovec, who was operating in an undercover capacity, posing as a currency smuggler.

On March 25, 2004, SSA V'Dovec called phone number (604) 916-7315 and spoke to "Master Jack." Based on the circumstances set forth below, "Master Jack" was later identified as defendant Jack Nichols. All of the phone contacts between SSA V'Dovec and the subjects of this investigation, including Nichols, were recorded. During the phone call, SSA V'Dovec told Nichols that he was instructed to contact him regarding a money pickup. Nichols stated that he did not have the money at that time, but he would be able to meet with SSA V'Dovec on March 27, 2004.

On March 26, 2004, SSA V'Dovec contacted Nichols at the same phone number, and asked if they could meet on March 28th. Nichols spoke briefly with another person who was with him. SSA V'Dovec overheard Nichols tell the other person that he had "Lenny" (SSA V'Dovec's undercover name) on the phone. Nichols then told SSA V'Dovec that Sunday was not good for him, but that it would be dealt with later. Nichols stated that he would call SSA V'Dovec back later to discuss the transaction.

On March 27, 2004, SSA V'Dovec contacted Nichols at the same phone number, who stated that he was ready to meet immediately. SSA V'Dovec told Nichols that he was out of the area, but that they could meet on March 28th. SSA V'Dovec further stated that he expected to receive $500,000. Nichols acknowledged that the money was ready to be picked-up, and that it was actually $750,000. Nichols said that someone would be in touch with SSA V'Dovec to arrange the drop-off. Nichols then asked SSA V'Dovec to call him later that day or the following morning.

COMPLAINT/NICHOLS -4

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Later on March 27, 2004, SSA V'Dovec attempted to call Nichols again at the same phone number. The call was forwarded to a voice message. The message was spoken in the same voice used by "Master Jack." The message stated that this was the voicemail for "Mr. Jack Nichols." SSA V'Dovec left a message that he was making his way back to the area and that would call Nichols the following morning.

On March 28, 2004, SSA V'Dovec contacted Nichols at the same phone number and asked whether they were going to have the meeting. Nichols replied that it was "all taken care of." SSA V'Dovec replied, "Maybe next time," to which Nichols responded in the affirmative. Based on the above conversation, and his extensive experience as an undercover agent in this investigation and others, SSA V'Dovec understood Nichols' comments to mean that Nichols arranged for the smuggling of the currency through another (unknown) courier, rather than using the services of SSA V'Dovec. This occurred on numerous instances throughout the investigation with respect to other targets, including unindicted coconspirator #1.

C.  **Robbery of Currency From Undercover Agents**

On March 30, 2004, SSA V'Dovec was acting in an undercover capacity picking up bulk cash which was to be smuggled into Canada at the behest of unindicted coconspirator #1. At the exchange, the undercover agents were robbed at gunpoint. As set forth below, a RCMP undercover agent later discussed the circumstances of the robbery with Jack Nichols.

The currency smuggling attempt which culminated in the robbery began on March 29, 2004, when the RCMP undercover operative received a text message from coconspirator #1 stating that the undercover operative was to arrange for the smuggling of $530,000 cash by contacting "Johnny" at phone number (206) 235-5607. The RCMP passed along this information to SSA V'Dovec.

On March 29, 2004, SSA V'Dovec had several phone conversations with "Johnny" at phone number (206) 235-5607. They arranged to meet the next day in the Southcenter

COMPLAINT/NICHOLS -5

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  area of SeaTac, Washington. "Johnny" told SSA V'Dovec that he was going to deliver
2  $1,000,000 cash for V'Dovec to smuggle into Canada.
3        On March 30, 2004, SSA V'Dovec had several additional phone conversations
4  with "Johnny" at the same Seattle area phone number. They arranged the meeting
5  location, and "Johnny" stated that he would be sending another person to deliver the
6  money, which would be in the amount of $500,000. "Johnny" stated that the person
7  delivering the money was also named "Johnny."
8        Later on March 30, 2004, at approximately 12:40 p.m., SSA V'Dovec and another
9  ICE agent, SA Bryan Winger met with "Johnny" in the parking lot of the Best Buy store
10  in Southcenter mall. "Johnny" delivered a green sports bag to the agents. SSA V'Dovec
11  asked how much money was in the bag. "Johnny" stated "380," referring to $380,000
12  cash. "Johnny" further stated that he counted the money himself. SSA V'Dovec then
13  said that he expected $500,000, to which "Johnny" simply replied, "380." "Johnny"
14  handed the bag to SSA V'Dovec, who placed the bag in the rear seat of his undercover
15  vehicle. SA Winger told "Johnny" that he was going to smuggle the money into Canada
16  later that night by running over a trail across the border. "Johnny" acknowledged this,
17  and then entered his vehicle and began driving away.
18        At that time, a Suburban vehicle stopped abruptly behind the undercover vehicle.
19  The door to the Suburban was opened, and the agents saw an Asian male with what
20  appeared to be a MP-5 type firearm. The Asian male was initially seated facing forward,
21  with the muzzle of the rifle pointed toward the floor of the vehicle. SSA V'Dovec saw
22  that the magazine in the rifle was thin and similar to a 9mm - .45 caliber magazine. The
23  Asian male then yelled at SSA V'Dovec and SA Winger, and pointed the firearm directly
24  at them. SSA V'Dovec yelled "gun," and shoved SA Winger toward a hedge of bushes in
25  front of the undercover vehicle. The agents then fled the scene. When they returned, the
26  green sports bag was no longer in their vehicle; it appears to have been taken by the
27  occupants of the Suburban.
28

COMPLAINT/NICHOLS -6

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Subsequent investigation established that the Suburban belonged to the Enterprise
2  Rent-A-Car store located in Renton, Washington. The vehicle had been rented by
3  Sakhone Thepmany. Thepmany was subsequently charged with Robbery, in the case of
4  United States v. Sakhone Thepmany, CR04-210L. Thepmany pled guilty to the offense
5  on December 9, 2004.

### D.  Aftermath of the Robbery

7  Just prior to the robbery, on March 30, 2004, at approximately 12:19 p.m.,
8  coconspirator #1 sent a text message to the RCMP undercover operative with instructions
9  regarding how some of the cash which was being picked-up in Southcenter should be
10 dispersed. In the message, coconspirator #1 requested that $250,000 be delivered to
11 "Bud" with contact phone number (778) 883-7369. Shortly thereafter, coconspirator #1
12 sent another message stating that the "cash is for the boys."

13 Later on March 30, 2004, coconspirator #1 learned about the robbery. That
14 afternoon, coconspirator #1 met with the RCMP undercover operative and an RCMP
15 undercover agent to discuss the robbery. This meeting was consensually recorded by the
16 RCMP undercover agent. During the meeting, it was agreed that the RCMP undercover
17 agent would pay coconspirator #1 $250,000 to "make good" on the money that had been
18 stolen. Conspirator #1 then directed the RCMP undercover agent to make two cash
19 payments: (a) $150,000 to someone named "Len," and (b) $100,000 to "Jack."
20 Coconspirator #1 provided the phone number for "Jack" as (604) 916-9742.

21 The RCMP undercover agent subsequently called "Jack" at the above phone
22 number and arranged a meeting to deliver the cash as instructed by coconspirator #1. On
23 April 2, 2004, the RCMP undercover agent met with Jack Nichols at the Burnaby
24 Mountain Golf Course in Burnaby, British Columbia. This meeting was consensually
25 recorded by the RCMP undercover agent. Nichols told the undercover agent that he did
26 not blame "them" (meaning the undercover currency smuggling organization) for the
27 robbery. Nichols further stated that someone could get hurt over this, referring to the
28 armed robbery. The RCMP agent said that he did not like to see this type of violence, and

COMPLAINT/NICHOLS -7

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970

that they never had problems with Nichols' people in the past. The undercover agent told Nichols that he trusted his guys (referring to undercover ICE agents V'Dovec and Winger), and that they had done things for coconspirator #1 in the past. The undercover agent further stated that "his guys" were good, but when someone points a machine gun at you it becomes a different ball game.

Nichols explained that he had been down there (Seattle) last week with the money, and that he was not impressed with the situation. Nichols said that he does not like to deal with people he does not know. Nichols further stated that in light of what happened (the robbery), he would get a hotel room next time and deliver the money himself. The RCMP undercover agent again stated that he trusted his guys. Nichols agreed, and said that the problem was not on their end. At the conclusion of the meeting, the RCMP undercover agent delivered to Nichols a package containing $100,000, as instructed by coconspirator #1.

In May 2005, the RCMP undercover agent reviewed the above-referenced telephone conversations between "Master Jack" and SSA V'Dovec. The RCMP agent confirmed that "Master Jack's" voice sounds similar to the voice of Jack Nichols, with whom he met on April 2, 2004, as described above.

On June 3, 2005, at approximately 6:00 p.m., Jack Nichols attempted to enter the United States from Canada at the Pacific Highway truck crossing. Nichols was referred to the secondary area, where he waited in the lobby of the border office. Border Inspectors notified SA Van Kirk that Nichols was at the border. SA Van Kirk arranged for other agents to contact the RCMP undercover agent, who arrived at the border shortly thereafter. The RCMP agent observed Nichols sitting in the office lobby, and confirmed that Jack Nichols was the same person he met with on April 2, 2004, as described above.[2]

---

[2] This "live" identification procedure was conducted to ensure an accurate identification. The RCMP undercover agent previously reviewed an older British Columbia driver's license photograph of Nichols, but was unable to positively identify Nichols based on the dated nature of the picture.

COMPLAINT/NICHOLS -8

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970

At approximately 7:30 p.m., SA Van Kirk placed Nichols under arrest, based on the probable cause set forth herein. SA Van Kirk advised Nichols of his Miranda rights, and Nichols waived those rights and agreed to talk with SA Van Kirk and the RCMP undercover agent. The RCMP agent reminded Nichols that they previously met at the golf course, as described above. Nichols responded with words to the effect, "Yeah, I remember the golf course." Shortly thereafter, Nichols invoked his right to counsel. Nichols was later transported to the Whatcom County Jail.

## CONCLUSION

Based on the foregoing, there exists probable cause to believe that the defendant, Jack Nichols, committed the offense of Conspiracy to Engage in Bulk Cash Smuggling, in violation of Title 31, United States Code, Sections 5332(a) and 5332(b)(1).

NATHAN CLAMMER, Special Agent
Immigration and Customs Enforcement

SIGNED AND SWORN to before me this 4 day of June, 2005, by Nathan Clammer.

MONICA J. BENTON
United States Magistrate Judge

COMPLAINT/NICHOLS -9

UNITED STATES ATTORNEY
601 UNION STREET
SUITE 5100
SEATTLE, WASHINGTON 98101
(206) 553-7970